O.L. v. Carl Carson Mr. Jeffrey, it's my understanding that you waived me any uninterrupted time. Yes, sir. All right, sir, you're up. Thank you. Please, the Court, I have the honor of representing Lt. Cassidy, Officer Hunter, and Officer Carson, and I'm very honored to be in front of this entire Court on the case. This will be the third time it's been argued, this first time to the entire Court. All right, if you will, maybe for my purposes, keep your voice up nice and robust in the mic so at least I can hear you and some of those back there want to hear. I will, Your Honor. Hundreds of pages, thousands of words, countless hours of time spent by the lawyers and the courts for addressing whether Lt. Cassidy and Officer Hunter reacted to an armed gunman in an objectively reasonable manner during mere seconds of time, and if not, whether clearly established law prohibited their reaction to this situation. This alone should suggest that the law is not clearly established in the circumstances the officers faced. Officer Carson is accused of falsely reporting what he saw, and the record shows Plaintiff's Own Experts reports or affidavits attached to the complaint that Officer Carson reported he didn't see what Mr. Cole was doing. But nonetheless, even accepting that accusation, the law is not clearly established to state that what Officer Carson is accused of violated the Fourth Amendment governing standards. I will try to, of course, answer all questions, but I would like to try to also save some time at the end to talk about the claims against Officer Carson, but I want to focus on the claims against Hunter and Cassidy. The Fourth Amendment analysis of the excessive force claim and the clearly established law qualified immunity component both require analyzing the facts that are in the record, and that includes all of the undisputed facts in the record and all of the material facts in the record. And it's undisputed that Mr. Cole was reported as being distraught. He had an argument with his family. He was armed with multiple guns, which he turned over some of to a neighbor. He was distraught over a breakup with his girlfriend. It was a school day during school hours. He was feared to be heading toward the school, high school. The high school and a nearby elementary school were alerted that they could be placed on lockdown. Officers were sent to the school. Officers from two cities were looking for Mr. Cole, and while this was happening, it was then reported that Mr. Cole had returned to his friend's and neighbor's house with more guns. He refused to turn over his last handgun, the one that he kept throughout the rest of the events, and he had threatened his friend. And it was broadcast on the radio that Mr. Cole had threatened to harm or kill anyone who tried to take his gun away from him. And with this, the officers continued searching for him. Officer Hunter on a motorcycle actually was present at the house, the neighbor's house, when this report was, when he heard the report about the threats. He left the house on a motorcycle and went to the scene where eventually he encountered Mr. Cole. Lieutenant Cassidy and Carson arrived in the area in their two cars at about the same time and were parked some distance away and were walking to where all of the officers converged. At the point of convergence, Officer Hunter was about 10 and no more than 20 feet away from where Cole eventually emerged from a wooded area. Lieutenant Cassidy and Officer Carson were walking along the edge of the wooded area that Cole had escaped into. And while the three officer defendants were approaching this area, it was again broadcast on the radio that Cole had put a gun against his head. When he had been encountered by two other officers, the other officers had repeatedly ordered him to drop the gun or surrender. He would not. And then Mr. Cole ducked into the woods. I think it's important to recognize— The problem is if you read your brief, it's all about disputing the facts. It's all about, oh, there is evidence that they told him to drop it. There is evidence of this and that. And if we accept your version of the facts, perhaps it is a different case. But isn't that exactly what we don't have jurisdiction over, the genuineness of the dispute of the facts? And we're not disputing the genuineness. Then why does the first several pages of your brief basically give your version of the facts, not Cole's version of the facts? Cole's version of the facts doesn't dispute what I have stated. Cole's version of the facts focuses on their interpretation of what's been stated. Well, your brief does talk about Officer Hunter warning Cole, but we have to accept that Cole was aiming the gun at his head, right? Yes. We have to accept that Cole was not facing or pointing the gun at Officer Hunter, right? No, that's not what the record shows and the evidence shows. The description of Cole not facing Hunter is that when the first shot was fired that struck him, he was at about this position holding his gun in his hand. Right, he's not facing or pointing the gun at Officer Hunter. That may not be the true facts of the encounter, but that's what we have to take on. But he is turning. He's in the process of turning around, and that's very clear in the dispute. Hold on. In order to get through it, you know, we just can't have three people talking at one time. So, the question over here was what the undisputed facts are, so let's try to hammer it. You dispute that one. The question was Cole was not facing or pointing the gun at Officer Hunter. You dispute that. We explained that when the court said he was not facing Hunter, that he was inside at a 90 degree angle from Hunter. And I'd like to direct the attention of the court to photographs that are in the record of Mr. Cole's injuries. In the record at 1447, I'm sorry, that's a description of the wounds, but when he's turning, the photos of a mannequin and his own body in the record at 1923 through 1931 demonstrate just what the expert, Mr. Bevel, Cole's expert testified to. The first shot that struck him was here. He exploded with his back to Hunter. He turned here when the first shot hit him, and the second shot fired by an officer that hit him breaks his arm. So, that is proof that he was turning. And when the record, when it's referred to as not facing, I think there's a difference between saying he's not facing and he was. Okay, thank you, Bruce. And that's showing he's at a 90 degree angle when he's turning, and that's when the first shot was fired. Okay, so it's kind of the turning that's causing the complication. Is it also something that we have to accept that Officer Hunter did not warn Cole even though he had time to do so? Is that something we have to accept? If you accept, yes. If you accept that, but I don't think that becomes material. The one thing that's interesting, the clerk called me Friday in one of the recordings which have now been transmitted by my office. There is a distinct voice on the recording that says, drop or drop it. Now, putting that aside, when you look at a warning, you have to determine is it both feasible and is it material? Well, there was maybe time to give a warning, but taking into account where Hunter was positioned, which is in the open, 10 to 20 feet away, he's watching. He testified in his affidavit and deposition that he was watching to see what Cole was doing. And so, even if you discount and accept that there was no warning given, then whether a warning was feasible is a whole other question. Counsel, Hunter did not, until a long time passed, so long after this event, ever assert that he gave a warning. His initial statements to the police, according to the findings, were that he turned and he fired, no warning given. That is correct. He stated that and explained that he did not remember giving a warning. Some years later, a lot of people's memory came back, so to speak. But that came after it was discovered that he had actually shot himself in the head. In other words, physically impossible. The story that was initially told was he turned, he faced, and he pointed the gun at me, and I fired. And they hustled, they huddled, and then said, that's the story. And they stuck with that story through the grand jury, correct me if I'm wrong. And then after, then it was discovered that no, that the 9mm went through the head, so it's kind of difficult to shoot yourself in the head while you're being shot and not be facing it. I want to direct you specifically to the findings of the District Court. First, your brief says Ryan continued to turn toward the officers when Defendant Hunter shot him, which is what you've just been saying. Contra, the District Court's determination, Defendant Hunter shot Ryan when he was initially facing away from the officers. After Ryan was shot, his body turned toward the officers, and he was shot a second time. And it goes on. It said Ryan's rotating occurred prior to the shooting. He was not rotating at the time of the first shot. Now that's the finding of the District Court, Hunter. And if I may address that. Yes. There's actually a chart in Cole's brief that points to some of these things, and I can address each of those matters. First of all, the quote from page 3466 of the record, Cole leaves out the entire quote, which says Cole was initially facing away from the officers at a 90-degree angle, holding a gun directed at his own head when he was first shot. That's what it said. At page 3467, Cole left out this chart. As he was turning toward the officers, one of the officers shot him with a second bullet. And then there's also a related reference in the chart to record page 3289 and 3290. But, counsel, you're referring to the second shot. The quote was, Ryan's rotating occurred prior to the shooting. He was not rotating at the time of the first shot. Now, let me pick you up on one other thing. In your brief, which you said 40 times, according to the chart, and I'll accept that number, that you've started to continue to turn toward the officers when the defendant, Hunter, shot him. Now, you cite 40 times something that's contrary to what the District Court found. Now, one of you, I don't know what's correct, but. Well, I don't think it's at all contrary to what the District Court found. The District Court recognized the undisputed evidence that Cole was continuously turning. And you have to recognize these shots were fired while he was turning during the 10.37 seconds. I appreciate that. And you say you're talking about some disputed evidence. But, see, that's the problem. You, at best, can hear. But I was hearing you correctly. And what the District Court said raised some dispute of the fact. And that's what seemed to go to the jury. Well, I don't think so. Because he is turning. If you pause during 2.37 seconds with a gun in your hand and fever on the trigger, and then you continue to turn during that 2.37 seconds, you're still turning. And that's what, if this Court is going to set a standard under the Fourth Amendment or clearly established law as to whether a pause during 2.37 seconds takes away the officer's right to take action in reaction to that, then that's going to be a tough thing for officers to deal with. I think it's important. Let's get to the point here. Because you say you are confined to the facts that are undisputed in the record. And, to be clear, those are the facts that are in the evidence. They are not necessarily what the District Court found. Although, in most respects, I think the District Court is 99% accurate. But the question of immunity is a question of law, is it not? Yes, it is. Whether the officer reasonably perceived that his life or those of others were in danger is a question of law, correct? Yes, Your Honor, it is. All right. And it has to be decided at a sufficient level of particularity. Do you know any case in which officers have been confronted with an armed individual who they knew had threatened danger to others who had his finger on the trigger as he is pivoting in the direction of the officers where qualified immunity was denied? No. In fact, Judge Higginson, in one of the arguments in the case, asked my opposing counsel the same question. And a couple of years ago, there were no such cases. And today, there are no such cases. Well, Mr. Jeffrey, in the brief, the blue brief, the first case that the counsel opposite cites when asked this question in the blue brief, so to speak, is Baker v. Putnell. A case from our court from 1996 involving a man who was shot in a car by a police officer. Now, I'll ask them. I take it that that's what they think their best case is for clearly establishing the law at the relevant particularity level. So what's your response to Baker? Baker v. Putnell. The facts were disputed as to what the subject with the gun was doing. The version that— Was it undisputed that he had a gun? It was undisputed he had a gun, but it was— In his hand? In his hand. And it was pointed at his head while he knelt on the ground in the province court. You may be thinking of a different case. Baker v. Putnell was a man shot in a car who had created—forgive me if I'm wrong, but I don't think I am. A man shot in a car had created a disturbance at a park with a shotgun. Oh, yes. Yeah. You are correct. Okay. You are correct. So created a disturbance at an outdoor area with a shotgun. People said there were shots fired. The police approached him while he was sitting in a car and shot him. Yes. So it sounds like this case. Why is that case—why does that case not establish clearly established law? It was in 1996. Well, there was a dispute as to whether he actually had the gun and whether it was in his hand. There was one version that was under the seat, if I recall correctly. There was another version as to whether he was moving or something under the seat. The version of the event that the district court accepted was contrary to what the officers were contending, and so the version that was accepted didn't have the gun in his hand with him moving it or himself or the officers. I was thinking of Graves v. Zachary. So that's the second case, Graves v. Zachary, which is an unpublished opinion from 2008. Why doesn't that one establish clearly established law? Graves v. Zachary? Yes. Well, at least two reasons. First, the facts are different. That's the one where the gentleman is kneeling, holding a gun against his head with his eyes closed and not moving when he's shot. And it's an unpublished— Well, how is that different from this case? Well, here it's undisputed that he's holding a gun. He is turning during 2.37 seconds when all of the shots are fired by the officers and himself. And I think it's important to recognize the position of the gun here in the cold case. It is also true in Graves v. Zachary. He was incapacitated by the first shot. And the second big real question was whether they should have shot him again. That's actually part of the question. There was a dispute as to whether the first shot incapacitated the suspect or not. Can an unpublished opinion ever— Can an unpublished, non-presidential opinion of this court or any other court furnish, quote, clearly established, close quote, law? Last year in Gelauder v. Woodall, the panel wrote unpublished cases may illustrate but not create clearly established law. The district court relied heavily on the lack of a warning. And the Supreme Court in Garner says the deadly force may be used if, where feasible, some warning was given. Yes. I think you already said that there was time to give a warning. So why wasn't it feasible to give a warning in this situation? Well, you have Officer Hunter in an uncovered area about 10 to 20 feet away from a man with a gun in his hand and a finger on the trigger. Hunter is watching to see what he's going to do. Hunter knows he's already threatened harm if anyone tries to take away the gun. So why not say police, drop it? He's not facing them head on. Well, there—again, there is a reporting tactic to that. If Hunter is watching and then the suspect starts turning his gun in his hand, that's an immediate threat of death. And I think it's, again, important. I'd like to point out where the gun was, not just in his hand, but where it was, because the record evidence shows that it was somewhere between 30 inches away from his head or closer, because that's evidence of my crippling to the wound area. But there's no blowback back in the gun barrel. Blowback would be blood tissue, if it's pointed and touching or near-touching, and that's why Detective Cook says the forensic examination shows no blowback. So we know it's not either touching or almost touching. We know it can't be further than 30 inches away because there's no crippling. An arm simply can't bend enough. So we know it's got to be somewhere in this area as he's turning. And I would give you an example. It just seems to me the problem is there's strong evidence that the initial story was a lie about the gun being aimed at the officer, and the DA dropped charges in light of that revelation from the forensic evidence. So given that, it's ultimately an objective standard. But if there was a real threat, even when he's holding the gun at his head, even when he's only at a 90-degree angle, why manufacture a story that makes the threat so much greater? Well, the officers perceive that that's what he did at the point. We're not arguing that that's what controls this case. The gun in the hand and turning before the officer after those threats, that's the threat of the case. But isn't it also in the record that he had already previously refused to comply with other officers' commands? Yes, multiple orders given by Sergeant Lord and Lieutenant Smith, I believe. The question is whether Hunter knew that. And I don't think there's any record that he did. Hunter, let me finish one thing. Hunter, as I read this record, conceded that if the gun were not pointed at him, that he was wrong and should not have fired. Now, if we want an objective measure, the officer made that judgment himself, and it was no sooner had he fired than he turned and he said, well, I had to shoot him, under the record, because he was pointing his gun at me. So he's not talking about turning or anything else. He said he pointed the gun at me. Now, physically, there's at least a genuine issue of fact as to how that gun could have been pointed at him when he reflexively fires into his skull. So, I mean, we're talking about whether genuine issues of fact, how they'll be resolved in something else. Well, my question is, if your own client, I mean, if Hunter says and concedes that, I think it's a necessary concession he makes, but he doesn't maintain this argument that you've constructed. He said, and I fired because the gun was pointed to me. And if it wasn't pointed to me, I shouldn't have done it. And he also didn't give a warning, because he didn't say that until later, well after he learned the consequences of that. Yes. If Hunter said that, you still have to evaluate the law from an objective, reasonable, most basis of what a reasonable… But why isn't the judgment of the officer on the line itself at least relevant in determining that? Well, I think it's relevant that two officers virtually… Isn't it relevant to notice? We're talking about we need a particular case to put him on notice. The officer himself said I shouldn't have done that at this point. They had notice of him. Officer Hunter and Lieutenant Cassidy virtually simultaneously fired based on what they perceived while this man was holding the gun and turning. Whether he meant that he was turning and pointing, whether it was pointed, I don't think is material to the objective reasonableness analysis or the clearly established law analysis. And if Hunter said that in his deposition, he certainly was cross-examined by a very confident opposing attorney. That helps sometimes. And I would hope my client agrees. May I add? Go ahead. I spent our entire time on the facts. Peter and then we'll go to Patricia. Do you agree that the alleged fabrication of charges claim is before us following remand from the Supreme Court? Yes. Or should that go back to the district court as the panel described it? No. The entire case is before you because the entire judgment of the panel is vacated. And Coles brings back Cotler v. American Tobacco for that proposition. And so we have the entire opinion before you that's vacated. And the opinion is wrong. The Supreme Court's man, Weldon Joliet, makes it clear this is a Fourth Amendment case. Devon Peck states the charge there is probable cause for the other offense to which Mr. Cole pled guilty. Then there is no Fourth Amendment. You may or may not be aware that the Seventh Circuit said and argued, it might have been indicative, but it's called the Holmes case, which one of the parties cited, that Devon Peck says that the fact that there is an arrest on a Fourth Amendment, arrest without probable cause on one claim is not a violation if there is another charge against that particular defendant that could support arrest. But it said that does not pertain to, in that case, malicious prosecution because you can have a charge, a series of charges against the defendant, one of which has some merit, here's a carrying a weapon unlawfully, and one of which does not, arguably the assault on an officer charge. And logically speaking, because the defendant has to spend money and here supposedly suffered in-house detention because of that charge, you have to evaluate those separately. If I may respond, I believe, if I'm not mistaken, there were an awful lot of cases that used the Holmes case to name William Joliet, because I think it was, and I think it named William Joliet relegated these types of pre-trial claims to the Fourth Amendment, and the Fourteenth Amendment, according to the Supreme Court, only implicated after a trial. And actually, there's a pair of cases that neither party cited in the briefing from this court, but I think it does some light, the Arizmendi, the Gabbard, and the Ritz-Carlton cases. In Arizmendi, basically, the Devin Peck was held to apply in a post-manual situation in the context of arrest on a warrant, but we don't have that here. In Ritz v. Palco, the officer is accused of making false reports, obstructing an investigation, much like the Holmes case, and serving as justification for the excessive force, like the allegation here. But the panel held that they qualified the meeting for the officers because the law at the time of the alleged conduct did not fully recognize that their conduct or actions under-concerned that behavior. All right, Mr. Jeffrey, that's a good stopping point, at least for here. You've fully reserved your rebuttal time to come back up. All right, let's hear from Mr. Ali. I understand that you want the first half of yours uninterrupted. Is that correct? Yes, Chief Judge Stewart. Actually, we've reserved that time, but I do plan to make clear to the court when I've completed my presentation, especially before that. All right. If you're ready, let us know. All right, you're on. Thank you, Chief Judge Stewart. Good morning, Your Honor. May it please the Court, I'm Amir Ali on behalf of Brian Cole, his mother, and his father. I plan to address the jurisdictional arguments, since the Court has questions about that when I pass my uninterrupted time and refocus the Court on the facts that it's jurisdictionally required to accept. I also plan to establish why the officers in this case violated clearly established law, and in particular, I have case law for the excessive force claim. At about 15 minutes, I will speak to my colleague, Jack Ayers, who will address the alternative arguments we have for why the officers violated clearly established law and are not entitled to qualified immunity, although I'll obviously say that we're prepared. All right, you better press ahead instead of telling us what you're going to say. You better start telling us. Well, let me begin by saying our position succinctly then, which is this. When an officer approaches a person because he has a gun, the officer cannot shoot the person based on some generalized instinct that the person might suddenly use the gun on him. That is our position. This Court has made that position, that principle clear in particularized case law. In fact, in our briefing, we pointed to particularized case law. We pointed to two cases, Baker and Graves, and I'm going to go through in a minute how particularized those cases are, and the appellants, the defendants, did not even cite those cases in response. And so before I get into the particularization, let me say this, because it's a really important observation, which is that the parties in this case occupy the opposite position from your ordinary qualified immunity case. In the ordinary qualified immunity case, you have a plaintiff who's walking into the court, and the judges of this court are usually thinking, okay, is this plaintiff trying to draw general principles from case law that is inapplicable? In this case, we have pointed to particularized case law, and the defendants have not contested that that case law is particularized in their briefing, and I'll address the few arguments that you see that there's really not much attention being paid to those particularized case laws. I'll address those arguments. And instead, what we see, okay, is the defendants pointing to cases like Ontiveros, like Rice, of this court. In each of those cases, there were specific threats known by the officers. In each of those cases, an order was given that was not complied with, and in each of those cases, there was a threatening movement. Okay, so what you have, and this relates to our jurisdictional argument, is on the one hand, you have the appellants arguing to the court that they should be able to shoot someone based on a generalized complaint. That's the reactionary gap argument, right? They're saying there's a reactionary gap. We don't know what this guy could have done. We could shoot him, okay? Then, on the other hand, you have them pointing to the case law of this court that is factually dissimilar from the circumstances. Warning given, specific threats known, and specific threatening movements. And that argument is why we think the narrowest ground for this court to accept is to simply dismiss this case for lack of jurisdiction. The only legal analysis appellants have offered you in their briefing, the extra reply brief they were permitted to file, and their initial briefing, proceed on cases that have no bearing on the case, that are in a totally different paradigm. Okay, I promised you that I would get to Baker and Graves and the particularization, and let me start with Baker, because I think there are eight key parallels to this case, okay? Baker, one, involved the use of force against the person. So we're not in the Malmix territory of trying to extend some general principle from Garner to a high-speed chase and make tactical decisions. Two, an officer is approaching a person he understands to be armed. Three, that person makes no threatening movements. Four, that person makes no verbal threats towards the officers. Five, the person may not even be aware of the officer's presence. The court said that in Baker as well. Six, the officer had time to give orders, but never gave any orders. And seven, decided to shoot first instead of giving orders. And eight, although the officer came into court and claimed that the plaintiff had leveled a gun towards him, the physical evidence, as in this case, indicated that the officer was not telling the truth. And then following that case in 2009, we have Graves. Let me just address a small point that came up. I think Judge Jones asked this question about an unpublished case. There's an important logical distinction between relying on a case that finds a constitutional violation to clearly establish a principle going forward and relying on a case like Graves, which recognizes that it is already clearly established under this court's case law, that you cannot do something. And that is the principle we rely on Graves for, which is logically distinct. In the alternative, Graves would only be persuasive. Here, Graves acknowledged, Judge Smith's opinion for the court acknowledged, that it was already clearly established. And in Graves, of course, you have the specific circumstance. Look how closely we are now to the fact of this case, where an individual was pressing a gun towards, pressing a gun to his head, pointing a gun to his head. And just to clarify, the court did reverse as to both shots in that case. The court noted, with respect to the first shot, that it is certainly material, that no warning was given. And then it noted, with respect to the second shot, that there were questions as to whether the person was even pointing the gun towards the officer. That was a question that was asked specifically by the court that needed to be resolved. So like Baker, like Graves, there are too many questions in this case. And let me, just for a brief moment, correct some factual propositions that were stated by my friend in his opening argument that are incorrect on the record. And I want to do so with specific record sites, because this court decides cases on evidence and facts and not on conspiracy theories or just allegations and beliefs. And I want to address some of the specific statements that my opposing counsel said Officer Hunter knew that it was undisputed that these officers knew because they didn't. Okay? So first, knowledge of these alleged statements, which are addressed in detail in the appellant's brief. For instance, that Eric Reed was only able to get certain guns away. Knowledge about prior domestic disturbances in his family. The officers testified four years later that they knew this guy. And these are the same officers who had already come into court and given a false story. Okay? So already you would be required to discredit the officers under the District Court's determination here on page two. And they're asking you to accept what was said, you know, four years later on page 4,000 or whatever, however you want to count the pages. Okay? Even, so we're already in that circumstance. But even if you look to what Officer Hunter said, and we are willing to do that kind of credit on page two, don't credit on page three, which this court should not be doing. Officer Hunter, day of the event, said he knew none of the specifics about this. All he knew, if we do have split difference crediting, is that Eric Reed was able to, that's the quote, was able to get guns away. So voluntarily relinquished some guns. Not anything about a threat. He never uses, Officer Hunter never uses the word threat. Let me go to two other things just really quickly, specifically, that my friend said that the officers knew. I'm sorry to interrupt you, but I think it means I can ask you a question now. Thank you. Is it true that in the Baker case, which you've listed as, I assume from your brief you think it's the best case. You can correct me if I'm wrong about that. But in the Baker case, is it true that there was a dispute about whether the victim was even holding a gun? So let me say it this way. It was undisputed that it was objectively reasonable for the officer to perceive that he was holding a gun. Was there a fact dispute on whether the guy, Baker, sitting in a car, was even holding a gun? So, Your Honor, yes. It turned out. So yes. Right. But, Your Honor, I think it actually should be telling that that is the argument that our panelists are making here, right? Defendants, when falsehood immunity is raised, defendants walk into court and say, you should judge this based on what the officers believe. That's what the Supreme Court tells us. Judge it based on what the officers actually mean. In Baker, it was undisputed that the officer perceived him to have a gun and he was approaching someone by the gun. And that is the distinction that we're trying to draw. I think it's very telling in this case because the question is the officer's perspective. And this court case law tells you when the officer's perspective is that he's approaching someone. Remember, in that case, it was actually a dangerous shooter. He had just been told the people in that car are armed and just shot that gun that you overheard in this crowded area, right? So these are all facts under which Baker was worse than this case. Here we're talking about... You know, I have an even more fundamental question about Baker, if I may ask you. And that is, Baker doesn't anywhere make a statement that if the police officer had shot Baker without seeing a gun, he would have been liable. All the panel says is it lists in two paragraphs. Here are disputed... There are too many disputed facts, which had to do with whether he even had a gun in his hand and had to do with the fact that he was shot in the back, not in the side like this fellow, as he was rotating. And therefore, I think Baker is not the unequivocal support that you claim it is. So, Your Honor, I wouldn't presume to speak for the court, but let me try to explain how I read Baker. In Baker, and it is worth pointing out, that in Baker it was undisputed that the individual was turning towards the officer, and the court said that merely turning towards the officer, and I want to get to this in one second because I think it's critical, is not sufficient. Now, the court remanded... Sorry, reversed... Sorry, the court sent it back to the district court on there being a genuine dispute of fact, and the review there was whether these facts that you just identified, Judge Jones, were material. And the court found that the fact that the officer had shot this person when he might have been facing away from the officer was material, that there was no warning given, or at least it was disputed, is material. Otherwise, the court's decision makes no sense. Well, it says, chaos on the beach and Baker Jr.'s mere motion to turn and face Putnell are not compelling reasons to find that Putnell's use of force was not excessive as a matter of law. Now, that is hardly a declaration, but if those facts were unequivocally found, it would be excessive as a matter of law. Are you not asking for us to say that clearly established law in these circumstances requires officers to give a warning before they shoot? No, Your Honor, we're not. The brief said that. Well, I apologize. Is that the impression that was given? But let me... It's a little bit more nuanced than that, Your Honor. So, first of all, I think, just on the Baker point, officers there argued there was no Fourth Amendment violation. They were entitled to qualified immunity. The court rejected it. That's all that's required to clearly establish that principle. In fact, the qualified immunity point goes beyond that because it says the law was already clearly established. But let me answer your question here about warning. The point here is this, Your Honor. We need to look to whether there is particularized case law. In the cases, officers established that there was a threat in several different ways. It can be a threatening movement by the plaintiff. It can be that they gave warnings or orders. It doesn't even have to be a warning to drop, you know, that I'm going to shoot you. It can be whatever the officer believed is appropriate in the circumstances and that there was noncompliance. And it can be prior statements by the person that were threatening. In the cases that appellants cite, all three of those were true. In our case, every single one of them is disputed. That is the difference between the case law. And that is why we think the court can actually resolve this on the narrowest ground, which is to just say they don't have jurisdiction to consider the argument that appellants are bringing. And what is the clearly established law? And you're not relying on Tennessee v. Garner as the clearly established law? Your Honor, we commend the panel opinion for its analysis because we think there is confusion in the Supreme Court statement that Garner... So on the one hand, you know, Garner can't be extended too far. We know you can't extend Garner to Malnick. But on the other hand, it continues to provide clearly established law. Is that a no answer to Judge Jones's question? Well, no, it's a yes answer, Your Honor. We pointed to cases in our... I just want to clarify this. Well, actually, let me just put a finer point on her question. Tennessee v. Garner is about somebody running away and jumping over a fence with $10 in his pocket who gets shot in the back of the head by a police officer. Now, how in the world could that provide particularized notice to the officers in this situation? Your Honor, I think the point is that it didn't... I don't think that's what the panel said. It said this was an obvious violation of Garner, not that it goes under the particularized prompt. I think this is... So let me just say very conflictingly this way. In our briefing, we pointed to the fact that this court's case law is consistent with the panel's decision and that the panel's decision just provides extra clarity and that other circuits' case law is consistent with that point. We've also given you several narrower grounds. The en banc court does not want to provide the clarity that the panel did. We've given you several narrower grounds, including that the court really doesn't even have jurisdiction to do the digging in the record at this interlocutory stage. And I'd refer the court, I think very importantly, to cases like Reyes v. City of Richmond, which we cite in our briefing. It would be an extraordinary result for the first panel to say, dismissed for lack of jurisdiction under Johnson v. Jones, to get GDR'd by the Supreme Court and then to reach the... Even the panel in this case, on the second go-around, didn't dismiss for lack of jurisdiction. We get it. The facts are construed in the light most favorable. All the factual disputes are resolved in favor of Ryan. But that doesn't mean that there's no jurisdiction to determine the legal question that Judge Jones led off this questioning with. Your Honor, this court's interlocutory jurisdiction is very limited, and a lot of cases ought to show that this court takes that very seriously. And that's for a good reason. Defendants can file many of these interlocutory cases. I just mentioned the Reyes case. If you look at the actual facts of that case, the officers came up on appeal. And what did they argue? They argued that this individual... This is Reyes v. City of Richmond. It's like two Reyes cases. This is the one Judge Smith was on the panel on. It was written by Judge DeMoss. The officers argued, this guy moved towards us when we shot him. This guy, we gave him a warning. And the court said, no, on his version of the facts, you shot him from behind. On his version of the facts, you gave him a warning, no jurisdiction. Before we move on, before we move off of this jurisdictional point, what would be the purpose of the U.S. Supreme Court's GVR if they thought there was no jurisdiction? Your Honor, when the U.S. Supreme Court GVRs a case, it's very well accepted they're not making a determination on the merits. They certainly were not making a determination that this court must exercise its jurisdiction under 1291. Was there a jurisdictional issue in Mullenix?  The thing in which... In Mullenix, the facts were undisputed. Exactly, so there's no jurisdictional issue. The difference here is that the appellants are trying to dispute not only the district court's determinations, which they are running affront, and we, on page 28 of our brief, do cite to various instances, and many throughout their brief, not just their facts section, which was what Reyes pointed to, but also throughout their legal history. Is there a reason for the GVR that the original opinion relied upon Luna v. Mullenix, which was the 5th Circuit opinion, and then Mullenix had reversed that? So the GVR can be easily explained by saying, you relied on a case we've now reversed. Look at it again. Judge Stewart, may I answer this question? All right. Succinctly, and then you're done. Judge Haynes, I think that's exactly right. It's an ordinary Supreme Court practice when a petitioner raises a claim that seems to bear on something that the court has just decided, they send them all back. This court knows that through its armed court of criminal act cases. You get these in droves. There's nothing indicating the court should rule in any particular way in this case. All right, thank you, Mr. Odley. Mr. Ayers? Thank you, Your Honor. May it please the court? Do I have the same understanding that you wanted seven minutes uninterrupted? Is that right? Your Honor, I hope that I give you a good bit of that time back. All right, go for it. Let me make this clear, because I don't think it is clear. The defendants are asserting two wildly inconsistent versions of facts in this case. On the one hand, the officer says, I shot this young man because he turned around and pointed a gun at me. I had no choice. I had to shoot him. It was self-defense. On the other hand, they want you to chase rabbit trails and concern yourself with how and in what manner he was turning and whether or not that could have created some possibility of a threat. You don't have alternative facts in the Fifth Circuit. The fact is these officers lied. It wasn't a mistake. It wasn't an accident. It was a lie. The deceased, or pardon me, nearly deceased, I forget, has stippling around the side of his head. Mr. Jeffrey says, oh, well, that doesn't really mean anything. He could have shot himself from 35 inches away. Try that out, those of you that have long arms, and see if you can get a gun around and shoot yourself in the head from 35 inches away. Stippling means that gunshot residue was injected under the skin and discolored the skin, and everybody on this court knows that. What an absurdity. Let me refresh your recollection of the binding determinations of the district court in this case, which I think are the end of the appellants. Here they are, and I'm giving you record facts because some of you don't know me. You might think I would elaborate in some way that I shouldn't, so you can look it up for yourself. This is Judge O'Connor's first finding. This is almost exactly the question that Judge Klum had asked during oral argument and one that Judge Higginson followed up. Pardon me, Higginson. I'll get it right in a minute, Judge. You'd think after three times I'd get it by now. I'm sorry. This is the first thing Judge O'Connor found. Contrary to the officer's stories, Ryan, quote, never pointed a weapon at the officers ever. Number two, Ryan was pointing the gun the entire time at his own head. Number three, when the officer shot Ryan, he was completely unaware they were present. Think of that. A police officer who shoots somebody from behind who doesn't even know he's present. You want to seriously tell me that's a threat? Fourth, very important, Ryan Cole, I'm sorry, I didn't give you the cites. My apologies. The first citation is 3467. That's on never pointing the gun. Pointing the gun the entire time is 3465. He was unaware of their presence is 3468. The next one, this is where I was. Ryan never made a threatening or provocative gesture of any kind toward the officers. That's at 3469. Never made a threatening or provocative gesture of any kind toward the officers. Fifth, the officers had the time and opportunity to give a warning and yet chose, to your point, Judge Costa, chose to shoot first instead. That finding is at 3468. Sixth, Ryan was shot by the officers when he was initially facing away from them at a 90 degree angle. That is at 3466. To somebody's question about turning, I believe it was yours, Judge Jones. After Ryan was shot, his body turned toward the officers. The citation on that is 3466. And the next citation is as he was shot the second time when one of the officers shot him with a second bullet, 3467. Judge Jones, if I may, to hopefully convince you of how ridiculous this notion is, the actual testimony of the expert was that the first shot, which went through his left arm through and through and ended up over his liver on the right side, was instantly incapacitating, but I guarantee you a nine millimeter round in the skull is immediately incapacitating. And I never worked a homicide case in my life when somebody was shot in the head that did the hula and did a lot of turning. They drop like a bag of flowers. They don't move. Just so we're clear on this, just so you're clear on this, exactly as Judge Elrod said, exactly as Judge Haynes said, the defendants in this case do not accept the findings of the district court. They quibble about them and they try to avoid them. Let me be specific. On page 28 of our brief, the defendants make this position. Ryan continued to turn toward the officers in a threatening manner when Hunter shot him, directly contrary to the district court's findings. Next, this is on their brief at page 7. The gun was not held continuously toward Ryan's head, directly contrary to the district court's findings. On page 7, the gun was not held against Ryan's head, and this is reasserted to your point, Judge Higginbotham, seven times in the record in affirmative misrepresentation of what the district court said. This is my favorite. On page 12, they say Ryan's death was, Ryan's shooting was the result of provocative action taken by him, directly contrary to the district court's findings. And finally, this is another favorite of mine, it was undisputed that the officer yelled, dropped it, and gave a warning before the shooting. There's an old country and western song, Are You Gonna Believe Me, Honey, or You're Lying Eyes. Listen to the recording, listen to the digital recording, and you tell me, Judge Costa, if you hear a warning. You won't. You'll hear the gunshots and then before a second volley of shots from Cassidy fired from a distance of over 100 feet away. You can imagine that if you're familiar with handguns, how ridiculous that is for a police officer, then you will find there's no warning. Both my experts said there was no warning, the district court found there wasn't. The district court's findings in this case are not just obligatory, they're jurisdictional. Because this court has held over and over again, Johnson v. Jones at the Supreme Court level, and the famous case of Kenney v. Weaver in this court, has specifically held you do not have jurisdiction to review the genuineness of those facts. One of your cases is directly on point on the subject of whether or not that's a determination of law or a determination of fact. Whether an officer in this situation faces a threat, this court has held under its binding precedent as a question of fact. Mr. Ayers. That case is Flores v. City of Flesh's, Judge. Thank you. My question is about the initial confrontation between Mr. Cole and the officers Sneed and Jordan, I believe their names were. And my question is, is that after Mr. Cole refused to stop and walked away from those officers with the gun pointed to his head, is it undisputed that a police report went out to all officers informing them of what had happened? There is a, there is, I'm trying to be completely accurate, I don't want to get off the subject too slightly. That happened about five minutes before the shooting. I'm sure Mr. Jeffrey and Penn didn't tell you that, he forgot. But the actual facts are that they put out a broadcast saying that they gave out a description of him, said nothing, and they said he was holding a gun to his head. Which would tell any reasonably prudent police officer that you can expect when he comes up out of the forest on the other side, he's going to be holding a gun to his head. Is there some evidence in the record, though, that Officer Hunter did not know the specifics of the call? Yes. Judge Higginbotham went over this in great detail in the second case. All these things that Mr. Jeffrey told you that the officers knew were first revealed for the first time four years later. In my experience, your memory gets worse with the passage of time. So do we have to take it that Officer Hunter and Officer Cassidy, neither one of them knew about the call or the threat? That's correct. That's the facts we have to take. It's true. I'm sorry. Is that right? I'm sorry, could you repeat it? I just said, is that we have to take the posture that neither Cassidy nor Hunter officers knew about any threat or call? I don't think it makes any difference, to be honest with you. I think the question is, according to your decision in Rockwell, and that wasn't her question. Her question was, is it disputed or is it undisputed? We'll decide whether it matters. Okay, good point, Jesse. The answer is, I don't think it's disputed. They put out a radio broadcast to that effect. Come back, Mr. Ayers. All right, let me come back. Judge Jones had a question. Judge Jones had a question. And then I'll come back over here. Judge Jones? Yes, sir. Three quotes from Mr. Bevel's deposition of July 24, 2014. Question. I'm sorry, his deposition or his affidavit? Bevel's deposition. Excuse me. Quote. This is at, I don't know why you explain it. I get confused about, I think it's 1970 of the record. Question. I don't have a recall of the page today. And we also know, don't we, based upon all the reports of those who witnessed the events, that Mr. Cole was rotating his body during the time of the shooting. Answer, yes. Page 1975. Question. What's the next one? Hold on. She's got five minutes, sir. Hold it up. Question, page 1975. I'm not eluding anything. So it's your opinion that Officer Hunter fired during Mr. Cole's rotation toward him? Yes. Page 1978. Well, question. Do you think that either of the shots that you contend that Officer Hunter fired that struck Mr. Cole, while Mr. Cole was squarely facing Officer Hunter? Answer. At the instant that the shot is fired and strikes the upper shoulder, that would be consistent with squarely. Now, does that mean he has stopped or he's still in that rotation, and he continues on to his left side hitting the ground, which is a question. But at the time, I mean, that's Bevel's rhetorical question. But at the time that it actually strikes, yes, he would be relatively squarely positioned in front of Officer Hunter, but not for the first shot. Now, if he was dropping immediately, according to you, we have to accept the expert's recitation as to how the volleys of shots occurred, but he was in the course of rotating. I don't care what the district court said. We're bound by the record. Actually, I believe you're bound by the district court's findings. Pardon me? Actually, I believe you're bound by the district court's findings. Not on some of the judgments. All right. You've given your answer. Let me back over here to Judge Higginbotham and then back to the other side. Put that in context. That testimony was with regard to the second shot? Correct. Not the first shot. He was collapsing, Judge Jones, is what I'm trying to tell you. You can say he was rotating. He was collapsing. He had been shot in the head and he had been shot through his rib. He was collapsing. The second wound, Your Honor, if you'll look at the pictures, you can see it, is a grazing wound of the left shoulder. It's consistent with being shot in this position. I'm not facing you. That's kind of hard for you to see. The wound is a superficial wound to the shoulder, exactly the way Judge Higginbotham described it. Well, I didn't see collapsing in Mr. Bevel's deposition. I believe that it's in his affidavit. If he says he collapsed immediately, he would be in the process of collapsing. He was immediately incapacitated. All right. On this side, there's Duncan. I'm sorry. I'm trying to. That's okay. If I missed your question, I didn't. No, that's all right. No, not your fault. Back to the police report. Yes, sir. Police report? The police, the call report that went out following the initial confrontation with the police officers where Mr. Cole walked away with a gun to his head. I thought you said, and I'll go back and look at the transcript, that it is undisputed that the call went out. The officers received a radio call that something had happened. Yes, sir. Right. Okay. So we have. Right. Okay. So in the record, we have the call report from 10-25-2010. That's 1829 of the record. And it says, subject was seen running south of 6018 Norfolk with three weapons, one 9mm is loaded. Subject is irate and distraught, stated they will shoot anyone. I mean, is that the record of the call report? I'm not sure. I don't recall the page. I don't recall the page number. But what Judge Higginbotham says is absolutely correct. All this information that they put in their, I think it was their affidavits or their declarations in support of their motion for assembly judgment or where they regurgitate all these facts that they say. But this call report is from the day of. Yeah. And it's also from 11-08. And the shooting happened at 11-15 or 11-14. Let's cut to the chase. Okay. That's not relevant? Back up to the mic. I'm done. I'm sorry. Go ahead. Let's assume that all that was true. Let's assume that all that happened. So what? So what? Rockwell says the question is whether the officer had justification for shooting at the very moment he made the decision to fire. Counsel, let me direct your attention to the actual film itself of the officer, Hunter. He arrives, and it's in the record, he arrives on his motorcycle, his bike, and he is told that we don't need you. Everything's in hand. He leaves the bike on that timeline. He's left his bike. He's gone, and he decides on his own to circle around and get on the other side. Am I correct about that? That's correct. So he intervenes himself. He's away from his bike. He's away from the entire thing of that broadcast. Now, is that correct or incorrect? Hold on. I'm out of time, Judge. Hold on. I understand. Just hold what you got. All right. You finished the question? All right. I'm coming back over here to Judge Ingehart, and then time's up. In your mic, Judge Ingehart. Just swivel the mic. If the ruling of the panel stands and the case is remanded, is it your position that the court would instruct the jury as fact-finders on qualified immunity and that that would actually be a defense evaluated on the jury verdict form? Or do you believe that issue is foreclosed? That's a very complicated question, actually, because you have model jury instructions that don't provide for that. The modern trend now is to use special interrogatories to resolve specific issues of fact. Well, that's why I'm asking, is it your position that that's how this case would be tried? I think the case would be tried almost exactly the way it was presented here as to whether or not these facts that the district court found a reasonable jury could find were true, whether he was, in fact, a threat, whether he did, in fact, that sort of thing. I didn't think about analyzing the content of a specific question. All right. Did I answer your question? I tried to, Judge. I hope I did. That's a very complicated question. All right. I think we've got as much as we can squeeze for now. All right. Thank you, sir. We're back over to you, Ms. Jeffrey, for our rebuttal. Counsel, is the law that what do you say to the opposing counsel's argument that the law is that if you are turning, even if you may have a weapon and you have time to give a warning and you don't, that the law is clearly established in the Baker case that you didn't cite? What do you say to the answer to Judge Jones's question? It's a very important question. What is the clearly established law? Is the law clearly established that if you're turning, that even if you have a weapon and if there's no warning, that the law is clearly established in that case? Baker v. Putnell. Your Honor, no, the law is not clearly established. Why not? Well, that's the problem with the whole concept of a warning coming out of Garner. It's a warning. I'll stay by the microphone. It's a warning if feasible. Well, there's not a case that I'm aware of that defines a rule as to what is feasible. But what about if there's no issue on the warning? Is there a, you know, in the Mance line of cases where there's usually a threatening act, turning can't be a threatening act, I don't think, under our case law now. So that's the problem. What is the threatening act in that line of case? You know, I'm not always, you know, I dissented recently in a case because I thought there was a threatening act. Is there a threatening act? What is the threatening act? The threatening act is making a turn with a gun in your hand that you can instantly point and shoot before the officer can react to stop that. That's the threatening act. And you can't just look at this in isolation. You have to look at what they knew before they encountered them. So do you disregard the case law then, the Baker case? No, the Baker case doesn't give a blanket rule that requires a warning or that prohibits shooting when somebody's turning. Well, then how could that case have been sent back? Why wouldn't the ruling have upheld the summary judgment? If it didn't matter in Baker, then the answer would have been we uphold the summary judgment on alternative grounds. And then I have a question after you answer that one. In Baker, if it was— You've started one already? I'm sorry. Have you finished answering that one? Have you finished answering Judge Elrod's question? You have? I have not. All right. If you would finish answering Judge Elrod's question, and then we've got a question from Judge Graves and then a question from Judge Clement. Thank you. Judge Elrod, the Baker case has a dispute as to whether there's even a gun in his hand. Here there's no dispute that there's a gun in his hand. And here there is no dispute he has given threats to anybody who tries to take the gun away. So with an officer who's uncovered in a bare, exposed position, 10 to 20 feet away, in that context, while the man is turning, there's no clearly established law requiring a warning and prohibiting the officer from shooting without a warning. And Mullinex and all of the recent Supreme Court cases that require clearly established law require you to look at all of the facts and circumstances. All right. So we're here to— In connection with Judge Engelhardt's question, do you agree that on remand a jury would still be free to determine whether or not the officers were entitled to qualified immunity? No. The question of qualified immunity is a question for the court to determine once the material facts have been resolved. And that's why this is perfectly appropriate now for this court with the material facts that we have accepted. But if the remand is because there are disputed issues of fact and it goes back on remand, you're saying the jury still wouldn't be free ultimately to determine that the officers were entitled to qualified immunity. Correct. That determination has already been made when we send it back on remand. Is that what you're saying? No. Although I will accept for argument that it could be sent back on the facts, the jury would determine the facts, but the issue of entitlement to immunity on the facts determined by the jury would be an issue of law. To be made by the trial judge? Yes, Your Honor. And that's why there's this trend that Mr. Ayers mentioned of special interrogatories to determine what the facts are. But here, if you look at the facts that have been determined and we accept those facts, the fact or the law is that the officers are entitled to qualified immunity. So the jury would be given special interrogatories on which facts they're determining, and then the judge reads those and decides whether or not the officers are entitled to qualified immunity. The trial judge. I think that's how it has to be done. All right. Judge Clement had a question. When you were answering Judge Owell's question about what the officers say is known and not known, it seems to me that you keep ignoring the fact that you described how Officer Hunter was threatened by someone turning around.  if the person turning around doesn't even know you're there? Well, Your Honor, the court determined, based on statements from Mr. Bevel, that Mr. Cole might not have even been aware or was not aware the officers were present. But the subjective state of mind of Mr. Cole is not relevant to the objective reasonableness test. What's relevant is that he had made an earlier threat, he had ignored orders, he's got a gun in his hand. I don't know whether Mr. Officer Hunter was threatened. He's saying he felt threatened. But how do you feel threatened by someone who doesn't even know that you're in the woods, no matter where you are? I just think it's significant that you're omitting that fact. But what you have, whether Officer Hunter can get into Mr. Cole's mind and know whether he's aware of his presence or not, you have a man holding a gun and turning towards the officer. And there's a recent, it's widely broadcast in the news media, April 11, 2019 shooting event in Florida. And we cite to the incident in our reply brief. And the man gets out of the car, starts running away. First thing he does is points the gun at his head as he's running away, and then he instantly turns and shoots the hat off of the officer who's shortly behind him. And then the officer returns fire. That's a threat. And I would submit here in the safety of this courtroom, where nobody's got a gun in their hand with a finger on the trigger, it's easy to say he shouldn't feel threatened because the man's merely turning. But if you look at that video and see the reality of what officers face on the street, a man with a gun in his hand points it at his own head and instantaneously points at the officer, fires, and shoots the officer's hat off of his head. That's the kind of threat these officers were facing. All right, one last question. Yes, sir. One last question from Judge Higginbotham. And a straightforward question so I can provoke from counsel a straightforward answer, and then we're done. Well, I was going to ask him if he was familiar with the practice in the Northern District of Texas on Rule 49 submissions of qualified immunity, which they'll submit that to the jury. If you're not familiar with it, apparently you're not, because I know the practice there, but I'm surprised to hear your answer. That's not the way we submitted them. I think there is a growing trend to submit them differently. I don't know about growing trends, but anyway. I'm also familiar, especially with Mr. Tumbrook, which I argued some years ago that the issue of qualified immunity came after some of the judgments for the judge. All right, I'm going to call a timeout at that point. Thank you, Mr. Jeffrey, for a brief argument. Thank you, counsel on both sides for responding. The case will be submitted. That completes our argument in these two cases in bank court. The case is adjourned.